UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PAMELA BOND, individually and on
behalf of all others similarly situated,

                        Plaintiff,

        v.

FLUKE CORPORATION and FLUKE
MANUFACTURING
CORPORATION,

                        Defendant.

CASE NO. 22-cv-1241 MJP

ORDER ON CROSS MOTIONS
FOR SUMMARY JUDGMENT

        This matter comes before the Court on Defendants' Motion for Summary Judgment

("Def. Mot." (Dkt. No. 41)), and Plaintiff's Motion for Partial Summary Judgment ("Pl. Mot."

(Dkt. No. 46)). Having reviewed the Motions, Defendants' Response (Def. Resp. (Dkt. No. 54)),

Plaintiff's Response (Pl. Resp. (Dkt. No. 56)), Defendants' Reply (Def. Reply (Dkt.  No. 58)),

Plaintiff's Reply (Pl. Reply (Dkt. No. 59)), and all other supporting materials, the Court

GRANTS Defendants' Motion and DENIES Plaintiff's Motion.

# BACKGROUND

Plaintiff Pamela Bond brings this action as a potential collective action on behalf of herself and others similarly situated for the non-payment of overtime wages under the Fair Labor Standards Act ("FLSA") and the Washington Minimum Wage Act ("WMWA"). (Complaint at 1 (Dkt. No. 1).)

Bond asserts that she, and others similarly situated, are entitled to overtime pay under the FLSA and Washington Law because they regularly work over forty hours and week. (Complaint at 4.) In response, Fluke argues that Bond and putative collective members were properly classified as administratively exempt under the FLSA. (Answer at 8 (Dkt. No. 19).) Administratively exempt employees generally include positions such as purchasing agents, which Fluke contests Bond is. The parties now bring cross motions for summary judgment as to Fluke's affirmative defense.

Bond worked as a "Buyer/Planner" for Defendant, Fluke Manufacturing Corporation ("Fluke"). She received a salary of $86,000 per year and was not entitled to overtime pay. (Def. Mot. at 1; Declaration of Scott Cornish, Exhibit 1 (Dkt. No. 43-1).) Her primary role as a buyer/planner was to purchase material and manage inventory for Fluke's production lines such that the inventory never got too high or too low. (Pl. Mot. at 5; Exhibit 3 to Pl. Mot., Deposition of Pamela Bond at 58:12-59:9 (Dkt. No. 46-3).) Because Bond managed too many parts to be ordered by hand, she used various planning methods that would generate signals that either caused parts to be ordered automatically or would prompt Bond to place an order. (Pl. Mot. at 2; Exhibit 4 to Pl. Mot., Deposition of Jason Sansoucie at 13:20-14:6, 15:6-15:23 (Dkt. No. 46-4); Exhibit 5 to Pl. Mot., Deposition of  Scott Cornish at 142:4-6 (Dkt. No. 46-5). The various planning methods are discussed in Fluke's Planning Methods Manual. (Pl. Mot. at 4., Exhibit  7

to Pl. Mot. (Dkt. No. 46-7).) The manual assists buyers/planners on which method to use and when to use it. (Pl. Mot. at 4; Ex. 4, Sansoucie Dep. at 17:22-18:17.) Bond also worked with suppliers for on time delivery, dealt with quality issues, "[took] care of" factory floor walk-throughs, and dealt with any part shortages that arose. (Pl. Opp. at 2; Miller Decl. Ex. 1, Bond Dep. at 58:12-58:23 (Dkt. No. 42-1).) She could affect part delivery by canceling orders, placing more orders, requesting vendors slow down or speed up delivery. (Pl. Mot. at 6, Exhibit 2 to Pl. Mot, Deposition of Richard Leisen at 39:18-40-13, 41:4-16 (Dkt. No. 46-2).) As a Buyer/Planner, Bond only purchased parts based on the signals she received from the planning methods implemented. (Pl. Mot. Ex. 3, Bond Dep. at 155:14-22.) However, she had the authority to purchase up to $250,000 in inventory for any single invoice without approval from a supervisor. (Cornish Decl. ¶ 5.) And her monthly inventory purchases typically exceeded $300,000. (Id. at ¶ 2.)

**ANALYSIS**

A.      **Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

1   Once the movant has met this burden, the nonmoving party then must show that there is a

2   genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the

3   existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

4   matter of law." Celotex, 477 U.S. at 323-24.

5   **B.      The Administrative Exemption to the FLSA**

6           Under the FLSA and the WMWA, employers are required to pay overtime wages for

7   "non-exempt" employees who work in excess of forty hours a week. 29 U.S.C. § 207, Wash.

8   Rev. Code § 49.46.130. Exempted from both Acts are persons employed in a "bona fide

9   executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1), RCW 49.46.130(1).

10  Because the FLSA gives no textual indication that its exemptions should be construed narrowly,

11  the Supreme Court has held that courts should give them a fair, rather than "narrow"

12  interpretation. Encino Motorcars, LLC v. Navarro, __ U.S. __, 138 S. Ct. 1134, 1142 (2018).

13  The employer bears the burden of showing that exemption applies. Bothell v. Phase Metrics,

14  Inc., 299 F.3d 1120, 1125 (9th Cir. 2002). Whether an employee's duties exclude her from the

15  overtime benefits of the FLSA is a question of law appropriate for determination on summary

16  judgment. Id. at 1124.

17          Under the FLSA and WMWA, an employee is administratively exempt if the employee:

18  (1) was compensated on a salary basis at a rate of not less than $684 per week; (2) has as the

19  primary duty the performance of office or non-manual work directly related to the management

20  or general business operations of the employer; and (3) the primary duty includes the exercise of

21  discretion and independent judgment with respect to matters of significance. 29 C.F.R. §

22  541.200; WAC 296-128-520. "Purchasing agents with the authority to bind the company on

23  significant purchases generally meet the duties requirements for the administrative exemption

24

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 4

even if they must consult with top management officials when making a purchase commitment for raw materials in excess of the contemplated plant needs." 29 C.F.R. § 541.203(f).

Fluke moves for summary judgment as to the entire exemption and argues that Bond is an exempt employee who is not entitled to overtime. Bond moves for partial summary judgment as to the second element of the administrative exemption test. The Court first analyzes Fluke' Motion as a ruling in its favor would negate the need for duplicate analysis of Bond's motions.

### 1.   Fluke's Motion for Summary Judgment

The Court finds that Fluke is entitled to summary judgment because Bond's position meets all three criteria under the FLSA and Fluke correctly classified it as administratively exempt.

####     a.   Bond's Compensation

There is no dispute the salary requirement is satisfied – and Bond does not argue otherwise. For Bond's position to meet the first element of the test Fluke must compensate her on a salary basis of not less than $684 per week. 29 C.F.R. § 541.200(a)(1). Fluke paid Bond a salary of $3,300 bi-weekly. (Def. Mot. at 9; Miller Decl. Ex. 1, Bond Dep. at 33:7-15; Declaration of Scott Cornish, Exhibit 1 (Dkt. No. 43-1).) The Court finds Fluke has met this element of the test because it paid Bond than the minimum salary basis.

####     b.   Bond's Primary Duty

The parties are in agreement that Bond's primary duty was to purchase material and manage inventory for Fluke, however, they dispute whether this duty directly related to the management or general business operations. The Court finds Bond's position directly relates to Fluke's general business operations, which satisfies the second element of the exemption.

To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the

1    employer or the employer's customers. 29 C.F.R. § 541.201(a). An employee's primary duty is

2    "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. §

3    541.700(a). For work to qualify for this exemption, "an employee must perform work directly

4    related to assisting with the running or servicing of the business, as distinguished, for example,

5    from working on a manufacturing production line or selling a product in a retail or service

6    establishment." Id. "Work directly related to management or general business operations"

7    includes work in functional areas such as purchasing and procurement. 29 C.F.R § 541.201(b).

8        The second element is commonly referred to as the "administrative-production

9    dichotomy" as it "distinguish[es] between work related to the goods and services which

10   constitute the business' marketplace offerings and work which contributes to 'running the

11   business itself." McKeen-Chaplin v. Provident Sav. Bank, FSB, 862 F.3d 847, 851 (9th Cir.

12   2017) (citing DOL Wage & Hour Div. Op. Ltr., 2010 WL 1822423, at *3 (Mar. 24, 2010)). The

13   requirement is met "if the employee engages in running the business itself or determining its

14   overall course or policies, not just in the day-to-day carrying out of the business' affairs." Id.

15   (internal quotation and citation omitted). Still, "the dichotomy is only determinative if the work

16   falls squarely on the production side of the line." Id. And "[the Court] must give deference to the

17   [Department of Labor's] interpretation of its own regulations through, for example, Opinion

18   Letters. In re Farmers Ins. Exch., Claims Representatives' Overtime Pay Litig., 481 F.3d 1119,

19   1129 (9th Cir. 2007); see also Auer v. Robbins, 519 U.S. 452, 461 (1997) (The Department of

20   Labor's interpretation of its own regulations is controlling unless "plainly erroneous or

21   inconsistent with the regulation").

22       When viewing the facts in the light most favorable to Bond, the Court finds Bond's

23   position does not fall on the production side of the administrative-production dichotomy. Bond's

24

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 6

1   primary duties were to purchase material for production, work with suppliers for on time

2   delivery, deal with quality issues, "take care of" factory floor walk-throughs, and deal with any

3   part shortages that arise. (Pl. Opp. at 2; Miller Decl. Ex. 1, Bond Dep. at 58:12-58:23.) Her

4   duties also included changing inventory arrival times by canceling, speeding up or slowing down

5   deliveries to meet production needs. (Pl. Mot. at 6, Ex. 2 to Pl. Mot, Leisen Dep. at 39:18-40-13,

6   41:4-16.) Essentially, her position was to maintain inventory such that there was never a surplus

7   or shortage. (Miller Decl. Ex. 1, Bond Dep. at 58:24-59:9.) Though her position supports

8   production, she did not work on the production line or contribute to the physical goods and

9   services Fluke offers. The Court finds her position does not fall squarely on the production side

10  of the line.

11          Instead, it is plain from the undisputed facts that Bond performs work directly related to

12  Fluke's general business operations. Neither party disputes Bond's position is non-manual work.

13  And her primary duty is to purchase material such that the manufacturing process functions

14  smoothly. The Court finds Bond's job is closely analogous to the description of the "purchasing

15  agent" that the Department of Labor contemplated as exempt in a March 6, 2008 Opinion Letter.

16  The Opinion Letter discussed purchasing agents whose main duties were to ensure "materials,

17  equipment, and supplies [were] timely ordered and delivered so the manufacturing process

18  functions smoothly; negotiate prices with vendors; [place] orders; [maintain] records and

19  [handle] returned goods; and [set] delivery times to maintain appropriate inventory level." DOL

20  Wage & Hour Div. Op. Ltr., 2008 WL 833151, at *1 (Mar. 6, 2008). The DOL noted that 29

21  C.F.R. § 541.201(b) specifies that work in purchasing and procurement are work that is directly

22  related to management or general business operations. Id. The DOL went on to find that it

23  believes the purchasing agents contemplated by it "perform office or non-manual work and that

24

1   their duties – ensuring that materials, equipment, and supplies are ordered and delivered and

2   participating in the vendor selection process – directly relate to the functional areas of purchasing

3   and procurement. Id. at *2. Though Bond's responsibilities do not include vendor selection or

4   negotiation, the majority of the responsibilities contemplated by the DOL overlap with Bond's

5   position. The Court finds the purchasing agents discussed by the DOL are sufficiently similar to

6   Bond, such that the DOL's reasoning in its Opinion Letter is applicable here. The Court finds

7   Fluke has demonstrated Bond's primary duty is directly related to the management or general

8   business operations in satisfaction of the second element of the exemption.

9          Bond argues that her primary duties involved carrying out Fluke's day-to-day affairs,

10  which are not considered part of the general business operations and are therefore not exempt.

11  (Pl. Opp. at 13.) The Court finds this argument unpersuasive. Bond's entire argument is an

12  attempt to distinguish her position from purchasing positions that other courts have found

13  exempt. (Id. at 15-16.) For instance, Bond cites to Bailey v. Alpha Techs, Inc., No. C16-0727-

14  JCC, 2017 WL 4167929 (W.D. Wash. Sept. 19, 2017), to argue that Bond is different from the

15  plaintiff in that case because the plaintiff's primary role was to negotiate the prices of materials

16  that her company used for products. (Id. at 16.) Bond similarly tries to distinguish herself from

17  two out of circuit cases where courts found purchasing agents exempt. (Id.) But Bond's argument

18  is misguided. Just because other district courts found purchasing positions exempt and those

19  positions differed from Bond's does not mean Bond's position cannot also be exempt. Rather,

20  the courts in those cases did exactly what the Court is doing here – applying the primary duties to

21  the regulations to see if the position satisfies the second element of the exemption test. And the

22  regulations, including DOL's interpretation of them, do not carve out a caveat that only

23

24

1     purchasing agents who have the ability to negotiate are exempt. Rather, a purchasing agent's

2     ability to negotiate speaks more to the third element of the test than the second.

3           Most of Bond's arguments regarding her primary duty are actually arguments as to the

4     amount of discretion she had, not what her primary duty was. Bond's briefs mainly argue that

5     Bond's position simply responded to "signals generated by the inventory planning methods

6     controlled by Fluke's standard processes." (Pl. Opp. at 16; Pl. Mot. at 12.) This argument, and

7     Bond's argument that she did not have the power to negotiate, are not arguments addressing her

8     primary duty, but instead whether she had discretion and independent judgment. Bond tries to

9     negate that the use of manuals can only be considered when addressing the third element of the

10     test by citing to 29 C.F.R. § 704, which she claims, "categorically rejects **all** [administrative]

11     exemptions based on application of well-established procedures described in manuals or other

12     sources . . ." (Pl. Reply at 11.) (emphasis in original). But Bond takes section 704 out of context.

13     Section 704 states that the use of manuals does not preclude administrative exemptions under the

14     FLSA, but the exemptions are not available for employees who apply well-established

15     techniques or procedures "within closely prescribed limits to determine the correct response to

16     an inquiry or set of circumstances." And Bond's citation to section 704 undermines her argument

17     because it is typically applied when determining whether an employee exercised discretion or

18     independent judgment. 29 C.F.R. § 541.202(e). Perhaps recognizing this fact, Bond cites to

19     section 704 to argue that she did not exercise discretion and independent judgment. (Pl. Opp. at

20     18) ("[N]oting Section 704 appropriately differentiated between manuals that dictate how an

21     employee must apply prescribed skills in recurring and routine situations, and manuals that

22     provide guidance involving highly complex information pertinent to difficult or novel

23

24

circumstances.") For these reasons, the Court finds Bond's arguments are more aptly applied to the third prong of the exemption test.

The Court finds that Bond's position meets the second element to be considered administratively exempt. Her position falls under the purchasing category and is directly related to Fluke's general business operations.

c.   Whether Bond Exercised Discretion and Independent Judgment with Respect to Matters of Significance

Fluke puts forth sufficient evidence that Bond exercised discretion and independent judgment with respect to matters of significance because she purchased inventory that had a significant financial impact.

The final element of the administrative exemption test asks the Court to determine whether the employee's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.202(a). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." Id. The phrase must be applied "in light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.200(b). "The term 'matters of significance' refers to the level of importance or consequence of the work performed." Id.

Factors courts should consider in determining whether an employee exercises discretion and independent judgment with respect to matters of significance include: whether the employee performs work that affects business operations to a substantial degree; whether the employee carries out major assignments in conducting the operations of the business; and whether the employee has authority to commit the employer in matters that have significant financial impact.

1   29 C.F.R. § 541.202(b). Under section 541.202(c), "employees can exercise discretion and

2   independent judgment even if their decisions or recommendations are reviewed at a higher

3   level."

4        The Court notes that the phrases "discretion and independent judgment" and "matters of

5   significance" are not separate tests, but should be considered in conjunction with one another.

6   Bollinger v. Residential Cap., LLC, 863 F. Supp. 2d 1041, 1049 (W.D. Wash. 2012) (noting that

7   in 2004, the Administrator deleted the phrase 'substantial importance' from the administrative

8   duty prong "and limited the concept to the discretion prong" thereby focusing the discretion

9   prong on the extent of discretion "and whether it concerned 'matters of significance"). Though

10  Fluke makes a number of arguments as to how Bond exercises discretion and independent

11  judgment, the Court only analyzes the arguments Fluke makes as to Bond's discretion with

12  respect to matters of significance as those are the arguments that are applicable to the third

13  element.

14       Before the Court addresses Fluke's more persuasive arguments, it discusses Fluke's

15  arguments wherein the evidence cited in support does not actually support what Fluke claims it

16  does. Fluke argues that Bond's discretionary decisions on inventory levels, purchasing timings,

17  and purchase quantities are matters of significance. (Def. Mot. at 18.) The problem with Fluke's

18  argument is that the evidence it cites in support does not fully buttress its argument. For example,

19  Fluke claims that Bond regularly made purchases totaling more than $1,000,000 a month. (Def.

20  Mot. at 18.) Fluke cites to Bond's deposition testimony for support. (Id.) But Bond testified that

21  while it could be that high, she was unsure of the actual total, and she would need to look at the

22  data to know. (Miller Decl. Ex. 1, Bond Dep. at 102:13.) And Scott Cornish, a Material Manager

23  for Fluke, whom Fluke also cites to in support, states that he reviewed Bond's inventory

24

1    purchases for January, February, and March in 2021, and found that Bond made purchases

2    totaling over $300,000 for each month. (Declaration of Scott Cornish at ¶ 4 (Dkt. No. 43).) There

3    is no indication that Bond "regularly made purchases totaling more than $1,000,000 a month."

4    (Id.)

5           Similarly, the record does not support Fluke's arguments that Bond's discretionary

6    decisions had a substantial impact on Fluke's manufacturing operations. Bond testified that if a

7    part shortage occurred, it could possibly shut down a production line. (Miller Decl. Ex. 1, Bond

8    Dep. at 43:3-6.) Fluke cites to this testimony to support its argument that if Bond's discretionary

9    decisions resulted in a shortage the plant would have to shut down for days or weeks. (Def. Mot.

10   at 4, 18.) That is an overly generous and self-serving interpretation of Bond's testimony that the

11   Court cannot accept at summary judgment where Fluke is the moving party. A production line is

12   not the same thing as the entire plant shutting down and Bond never discussed how long a

13   production line may be down due to a shortage. Further, despite Fluke's assertion otherwise,

14   Bond testified that a production line being shut down would not necessarily cause severe

15   financial damage, but instead would cause a delay in production and would probably effect on-

16   time delivery. (Miller Decl. Ex. 1, Bond Dep. at 43:7-11.) Fluke also claims inventory shortages

17   could cause Fluke to incur substantially higher freight expenses. (Def. Mot. at 19.) Again, this is

18   not supported by the cited testimony. Cornish testified that in the instance of a line-down

19   shortage Fluke has to use the fastest method to get parts and therefore has to spend extra on

20   premium freight. (Miller Decl., Ex. 2, Cornish Dep. at 74:17-75:17.) But Fluke does not put forth

21   any additional evidence to suggest that paying extra on premium freight is a substantially higher

22   cost. Fluke does not inform the Court how much freight expenses are generally, how much

23   higher they are if Fluke has to pay for premium freight, and critically, how this is significant to

24

Fluke's business. Similarly, though Fluke alleges that excess inventory can create significant problems for Fluke such as "cash flow issues, cluttered floors slowing down production, and increased material handling costs," Bond's testimony, which Fluke cites to in support, only discusses the issues that may arise but does not suggest that these issues are significant. The Court finds these arguments are unpersuasive because they are not supported by the evidence. And Bond correctly objects to Flukes arguments based on the misstated testimony. (Pl. Opp. at 2-3.)

Still, there is undisputed evidence to find that Bond exercised discretion with regards to matters of significance. Specifically, Bond's authority to bind Fluke to a $250,000 transaction without approval and Bond's routine monthly inventory purchases of over $300,000 is evidence of her discretion as to matters of significance. (Cornish Decl. ¶¶ 4-5.) The Court finds Fluke's argument here persuasive because the DOL's previously found purchasing agents exercised discretion in matters of significance when they made purchases in amounts less than Bond. In the DOL's March 6, 2008 Opinion Letter it found that purchasing agents who had the authority to place purchase orders less than $25,000 without manager approval demonstrated that the purchasing agents had authority to commit the employer in matters of significant financial impact. Wage & Hour Div. Op. Ltr., 2008 WL 833151, at *2 (Mar. 6, 2008). This finding was not negated by the requirement that managers had to approve purchase orders of more than $25,000, because "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." Id. The DOL also noted that "99% of purchase orders [made by the purchasing agents did] not require further authorization." Id. The same rationale applies here, especially when considering that Bond's purchasing authority was well above the $25,000 the DOL considered. Bond had the ability to place a

1   purchase order up to $250,000 without prior approval. The fact that she needed authority for

2   orders over $250,000 does not change the Court's finding, especially since she made monthly

3   purchases of over $300,000 without supervisor authorization.

4       Bond argues that her ability to make these purchases did not involve discretion and

5   independent judgment because she was not authorized to make purchases without receiving a

6   signal. (Pl. Opp. at 5-6.) But this argument is undermined by her testimony. Bond testified that

7   absent a signal "there would be no reason [to buy]," she did not testify that she lacked authority

8   without a signal. (Def. Reply at 10; Pl. Mot. Ex. 3, Bond Dep. at 155:16-17.) Indeed, Bond does

9   not dispute that she could make purchases of $250,000 without prior approval. And Bond had the

10  discretion to deviate when she received a signal to buy. (Def. Reply at 10; Miller Decl. Ex. 1,

11  Bond Dep. at 162:13-22.) She also had the discretion and used independent judgment to push an

12  order out. (Def. Reply at 10; Miller Decl. Ex. 1, Bond Dep. at 94:4-25.) Bond's testimony that

13  there would be no reason to buy absent a signal is simply indicative that she did not make

14  irrational decisions in her role. It does not mean that she had no discretion to make any purchases

15  without the signal. Indeed, such a contention is disputed by her own testimony.

16      The Court is also unconvinced by Bond's argument that her ability to purchase materials

17  that theoretically total over one million per year without prior approval does not mean that total

18  is significant to Fluke, which takes in billions in annual revenues. (Pl. Opp. at 19.) She contends

19  that to apply Fluke's argument that dollar amounts are per se proof of importance would

20  incorrectly classify "all sorts of employees, including cashiers, customer service representatives,

21  servers, and payment processors who may be involved in transactions totaling millions of

22  dollars, but who merely engage in day-to-day carrying out of the business affairs." (Pl. Reply at

23  11.) But this again conflates the second and the third element of the administrative exemption

24

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 14

1   standard, and similarly neglects to address Bond's discretion in these matters. Unlike a cashier or

2   customer service representative who is simply dealing with payments and transactions as they

3   come in, Bond is actively monitoring the inventory to order or hold supplies as needed. Her

4   discretion as to how much and when is guided by manuals and Fluke's processes, but she

5   nevertheless exercised discretion in how and when those processes were applied. (Miller Decl.

6   Ex. 1, Bond Dep. 86:9-87:18, 94:4-25, 95:8-11, 162:13-22.) And that discretion resulted in over

7   $300,000 in monthly purchases, which results in over $3 million dollars annually. The Court is

8   not persuaded that this amount is not significant to Fluke, and Bond simply makes the assertion

9   with no support to rebut Fluke's contention.

10          The Court finds that Bond exercised discretion with regard to matters of significance

11   through her ability to make purchasing decisions that had a significant financial impact. 29

12   C.F.R. § 203(f). Fluke has satisfied the third element of the test. And, having shown that there

13   are no disputes of fact that Bond is an exempt employee, Fluke is entitled to summary judgment

14   as to both of Bond's Claims. The Court therefore GRANTS Fluke's Motion and directs entry of

15   summary judgment in its favor.

16          **2.**    <u>Bond's Motion for Partial Summary Judgment</u>

17          Bond seeks summary judgment on the second element of the administrative exemption

18   test and argues that her primary duties do not involve running Fluke's business. (Pl. Mot. at 1.)

19   She also seeks summary judgment on Fluke's "good faith" defense. (<u>Id.</u>) Plaintiff's Motion and

20   her Opposition to Fluke's Motion for Summary Judgment are largely the same. (<u>Compare</u> Pl.

21   Opp. <u>and</u> Pl. Mot.) Because the Court has addressed Bond's arguments in its analysis of Fluke's

22   Motion for Summary Judgment it does not address them again. Bond has failed to identify a

23

24

1   dispute of material fact precluding summary judgment. The Court DENIES Bond's Motion for

2   Partial Summary Judgment.

3   **C.      Bond's Request to Strike**

4           Bond argues that Fluke's brief in opposition to Bond's Motion for Partial Summary

5   Judgment exceeded the word limit. She is incorrect. Bond contends that Fluke violated the local

6   rules because its brief in opposition contains 4,445 words and argues that the limit is 4,200

7   words. (Pl. Reply at 12.) Bond is confusing the word limit for reply briefs and the word limit for

8   briefs in opposition. Local Civil Rule 7(e)(3) states that "briefs in opposition shall not exceed

9   8,400 words . . . [r]eply briefs shall not exceed 4,200 words . . .") The Court finds Fluke did not

10  exceed the word limit in its opposition brief. The Court DENIES Bond's request to strike pages

11  thirteen and fourteen of Fluke's brief in opposition.

12                                      **CONCLUSION**

13          In viewing the facts in a light most favorable to Bond, the Court finds that Fluke has

14  demonstrated Bond's position is administratively exempt. Bond is paid on a salary basis above

15  the minimum requirement, her primary duty is directly related to general business operations as

16  opposed to production, and she exercises discretion and independent judgment as to matters of

17  significance. Because Bond is an exempt employee, her claims under the FLSA and WMWA

18  cannot proceed because she is not entitled to overtime. The Court GRANTS Fluke's Motion for

19  Summary Judgment.

20          The Court also notes that Fluke requested summary judgment as to Lisa Golder's claims

21  who initially consented to join this collective action. (Def. Mot. at 21.) However, this issue is

22  moot because Golder withdrew her consent to be a party to this lawsuit on September 13, 2023.

23

24

1   (Dkt. No. 60.) As such, the Court does not address the merits of her claim and finds the request

2   MOOT.

3         The clerk is ordered to provide copies of this order to all counsel.

4         Dated October 23, 2023.

5

6                                 Marsha J. Pechman
                                United States Senior District Judge